# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:25-CV-23861-RKA

PAMASA S.A.,

      Plaintiff,

v.

BANCO SANTANDER
INTERNATIONAL,

      Defendant.

_____/

BANCO SANTANDER
INTERNATIONAL,

      Counterclaimant,

v.

PAMASA S.A., BARBARA MANSILLA
ORTIZ, VALERIE MANSILLA ORTIZ, and
FRANCISCO OMAR MANSILLA ORTIZ,

      Counterclaim Defendants.

_____/

FRANCISCO OMAR MANSILLA ORTIZ,

      Crossclaim Plaintiff,

v.

PAMASA S.A., BARBARA MANSILLA
ORTIZ, and VALERIE MANSILLA ORTIZ,

      Crossclaim Defendants.

_____/

### FRANCISCO OMAR MANSILLA ORTIZ'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS CROSSCLAIM

Crossclaim Plaintiff Francisco Omar Mansilla Ortiz ("Francisco Jr.") files his response in opposition to the Motion to Dismiss Crossclaim (D.E. 30) (the "Motion") filed by Crossclaim Defendants Pamasa S.A. ("Pamasa"), Barbara Mansilla Ortiz, and Valerie Mansilla Ortiz (Barbara and Valerie are the "Sisters"). For the reasons shown below, the Court should deny the Motion.

## INTRODUCTION AND FACTUAL BACKGROUND

Francisco Jr.'s father, Francisco Rigoberto Mansilla Córdova ("Francisco Sr."), trusted the United States financial and legal systems. He thus opened accounts at Banco Santander International ("BSI") in the names of the entities that managed his assets, of which he was the sole ultimate owner. The Pamasa account was no exception—he controlled Pamasa, held primary signatory authority, and stood as its ultimate beneficial owner.  Now, the same scheme that caused him to disinherit his daughters (i.e., the Sisters) and pursue criminal proceedings against them in Guatemala is before this Court.  Relying upon a narrow framing of the dispute, tainted foreign proceedings, and an inapposite expert report, the Sisters ask the Court to accept their self-appointed status as Pamasa's "administrators" as sufficient to grant them control of the BSI account at issue so they can pillage what's left of their father's assets that had been held by Pamasa. In doing so, they ask the Court to ignore Francisco Jr.'s well-pleaded allegations that their claimed authority derives from fraud, collusion, and interference. As shown below, the Court must deny the Sisters' Motion because it is an effort to deflect from these threshold questions, which the Court must resolve before it determines who is entitled to control the funds in the account.

### The Allegations of Francisco Jr.'s Crossclaim

The Crossclaim (D.E. 23) details the Sisters' years-long scheme to fraudulently install themselves as Pamasa's purported "administrators" to divest their father of his estate and frustrate Francisco Jr.'s inheritance. The Crossclaim's allegations are as follows.

### A.  Francisco Sr. Restructures His Estate to Protect Against Meddling by the Sisters

Francisco Jr. and the Sisters are the children of Francisco Sr., who was one of Guatemala's wealthiest and most renowned businessmen. Crossclaim at ¶ 13. From 2013 to 2020, Francisco Sr.'s assets were held by a Panamanian private interest foundation called the Fundación San Isidro Internacional (the "Foundation"), of which he was the primary beneficiary and his children the secondary beneficiaries. *Id.* at ¶ 14. Amid growing tensions within the family, Francisco Sr., who retained exclusive decision-making authority over the Foundation, imposed strict conditions on

2

the Sisters' inheritance, making it impossible for them or their husbands to ever manage the family businesses. *Id.* at ¶ 15.

In retaliation for those restrictions, in October 2018, the Sisters tried to usurp Francisco Sr.'s control of the Foundation. *Id.* at ¶ 16. Forging his signature, the Sisters fraudulently amended the Foundation's bylaws to add a provision allowing a majority of its secondary beneficiaries (themselves) to invoke a mechanism to declare Francisco Sr. legally incapacitated. *Id.* The fraudulent amendment was invalidated when it was discovered. *Id.*

Francisco Sr. decided to restructure his estate due to his growing concern over the Sisters' attempts to fraudulently meddle with it. *Id.* at ¶ 17. In this connection, Francisco Sr. caused the Foundation to transfer its assets to two Guatemalan corporations for which he was the sole non-corporate shareholder, and which he believed were safely under his control: Pamasa and Agrícola El Amate S.A. *Id.* at ¶¶ 17, 35. Under the new estate planning, the two entities would operate with a "closed-circuit" structure, whereby each entity would own 99% of the shares of the other entity, with Francisco Sr. individually owning 1% of the shares of each entity. *Id.* at ¶ 24.

On February 4, 2020, Pamasa and Agrícola El Amate each held a General Shareholders' Meeting, both to appoint officers and directors, and to authorize the entities to receive the Foundation's assets. *Id.* at ¶ 18. During these meetings, Francisco Sr. was appointed the president and legal representative of each entity; Francisco Jr. the vice president and legal representative of each entity; and the Sisters board members of each entity. *Id.* Thereafter, Francisco Sr.'s and Francisco Jr.'s appointments were registered in Guatemala's Commercial Registry, giving them (and only them) the legal authority to act on behalf of the entities. *Id.* at ¶ 19. Francisco Sr. also effectuated the transfer of the Foundation's assets (i.e., his personal assets) to the two entities, including by opening and funding a bank account in Pamasa's name at BSI in Miami, Florida—i.e., the account at issue in this case. *Id.* at ¶ 21.

Although Francisco Sr. had been advised that Pamasa's and Agrícola El Amate's cross-ownership structure would perpetuate his exclusive control of the entities, as he envisioned, he intended to invert the structure so that he would personally own 99% of the shares of each entity and so that each entity would own 1% of the other's shares. *Id.* at ¶ 25. To that end, on July 1, 2020, he convened General Shareholders' Meetings for each entity to effectuate that transaction. *Id.* Unfortunately, the meeting minutes from the July 1, 2020 Meetings contained a notarial error—i.e., the minutes reflected that the Meetings had been held on the same date and at the same time

3

and place, with the same notary acting as secretary. *Id.* at ¶ 27. After discovering the error, Francisco Sr. convened new General Shareholders' Meetings on October 28, 2020, at which the resolutions that had been adopted on July 1, 2020 were annulled, thus leaving the entities' original ownership structure intact. *Id.*

**B.  The Sisters File the Tainted Amparo Proceeding in Guatemala**

In 2021, shortly after Francisco Sr. restructured his estate to safeguard his assets from meddling by the Sisters, they reinitiated their efforts to usurp control of his estate. Specifically, on April 11, 2021, Valerie filed an *amparo* proceeding in Guatemala against the Boards of Directors of Pamasa and Agrícola El Amate (the "Amparo Proceeding"). *Id.* at ¶ 28; *see also id.* at Ex. 1. In Guatemala, an amparo is a legal action that seeks to protect parties from violations of their constitutional rights. *Id.* at ¶ 28. In her capacity as a member of the entities' boards, Valerie generally alleged that there was an imminent risk of a violation of the entities' property rights due to the attempted theft of corporate assets by Francisco Sr. *Id.* at ¶ 29. Valerie also claimed that Francisco Jr. and an allegedly dishonest notary were enabling this supposed theft. *Id.*

From the outset, the Amparo Proceeding suffered from blatant procedural and substantive irregularities. First, and most glaringly, Valerie filed the Amparo Proceeding in a criminal court in a small province in southern Guatemala with no connection to the parties or the dispute: the Court of First Instance for Criminal Matters, Drug Activity, and Environmental Felonies of Santa Lucía Cotzumalguapa, Esquintla (the "Santa Lucía Court"). *Id.* at ¶ 30. Each of the parties and interested third parties were domiciled in or near Guatemala City, 100 kilometers away. *See id.*

Second, as noted, Valerie's theory of harm—that Francisco Sr. was attempting to engage in theft—was facially non-sensical given that he was the sole non-corporate shareholder of each entity and the ultimate beneficial owner of **all** of the entities' assets. In support of her theft allegations, Valerie relied primarily on the erroneous meeting minutes of the entities' July 1, 2020 General Shareholders' Meetings, which she claimed reflected Francisco Sr.'s intent to siphon assets to himself by changing the entities' ownership structure. *Id.* at ¶¶ 31–32. Setting aside the facial absurdity of these allegations, Valerie's petition failed to disclose that the notarial errors from the July 1, 2020 Meetings—i.e., the purported evidence of fraud—had already been corrected, leaving intact the original ownership structure, and thus vitiating the very premise of the petition. *Id.* at ¶ 32. With respect to Francisco Jr.'s alleged involvement, the amparo petition alleged, without any supporting details, that he was assisting the purported theft. *Id.* at ¶ 33.

Third, the rapid pace at which the Santa Lucía Court granted Valerie's amparo petition and its sweeping relief—combined with other irregularities—strongly indicates collusion. On April 12, 2021, the Santa Lucía Court, through Judge José Wilfrido Umaña Calderón, granted the petition on an *ex parte* basis, several hours after the petition had been date-stamped as received (the "Provisional Amparo"). *Id.* at ¶ 37.[1] Through the Provisional Amparo, Judge Umaña, among other restrictions, provisionally suspended Francisco Sr. from serving as president and legal representative of Pamasa and Agrícola El Amate; provisionally suspended Francisco Jr. from serving as vice president and legal representative of the entities; and appointed Valerie as the entities' temporary legal representative. *Id.*; *see also id.* at Ex. 2. At the time of the petition, Valerie was not designated in Guatemala's Commercial Registry as a legal representative of either entity, and the Santa Lucía Court did not explain or make any findings that would support her standing.

Fourth, the Amparo Proceeding lacked any semblance of even the most basic conceptions of due process. For example, the Santa Lucía Court failed to provide Pamasa and Agrícola El Amate with notice of the proceeding and the opportunity to submit a "detailed report" within 48 hours as required by Guatemalan law. *Id.* at ¶ 38. The Provisional Amparo, although nominally a "provisional" measure, also did not contain an expiration date or contemplate further proceedings to contest it. *See id.* Moreover, when Francisco Sr. and Francisco Jr. learned of the Provisional Amparo **informally** in the days after its issuance, and attempted to respond to it, the Santa Lucía Court declined to consider their submissions at all. *Id.* at ¶ 39. Accordingly, the Provisional Amparo effectively disowned Francisco Sr. from his own substantial estate, and ousted Francisco Jr. from his managerial roles in the entities, all without a single opportunity to be heard in response to Valerie's allegations or a single factual or substantive finding supporting it.[2]

Ultimately, in view of the blatant gamesmanship evident in Valerie's filing of the Amparo Proceeding in a distant, compromised court, in 2022, the Amparo Proceeding was transferred to the Seventh Court of First Instance for Civil Matters of Guatemala, which had jurisdiction. *Id.* at

---

[1] This response refers to the Santa Lucía Court's ruling as the "Provisional Amparo," and to the Guatemalan Constitutional Court's ruling affirming the Provisional Amparo as the "Amparo."

[2] Critically, in November 2023, based on a complaint that Francisco Sr. had filed shortly before his death, Guatemala's Supreme Court of Justice (i.e., Guatemala's highest court) lifted the presumption of judicial immunity surrounding Judge Umaña, and authorized a criminal investigation into his potential abuse of authority in connection with the Amparo Proceeding. Crossclaim at ¶ 67. That investigation, and an ensuing criminal case against Judge Umaña, are ongoing. *Id.*

¶ 54. On May 24, 2022, the Seventh Court *dismissed* Valerie's amparo petition, reasoning that a constitutional protection action was premature, as Valerie had failed to exhaust ordinary procedures. *Id.*; *see also id.* at Ex. 3. Valerie (and Barbara, who had intervened as a party in the interim) appealed and, on July 18, 2022, the Constitutional Court of Guatemala reversed and reinstated the Provisional Amparo, as by that point Francisco Sr.'s health had deteriorated such that he was in a coma and thus not in a position to manage the entities. *Id.* at ¶ 55. The Constitutional Court, however, emphasized the provisional nature of its ruling. *Id.* at ¶ 56; *see also id.* at Ex. 4. Indeed, the Constitutional Court's opinion explicitly contemplated that its ruling was non-final; the Court also contemplated that its ruling would "under no circumstances affect the operation" of the entities, and that it was merely setting the conditions under which the entities were to be represented "until the relevant jurisdiction declares who should act as the definitive representative" of the companies. *Id.* at ¶ 57.

## C.  The Sisters Use Their Purported "Control" to Entrench and Siphon Assets to Themselves

Francisco Sr., who died in July 2022, spent the final years of his life doing everything he could to prevent the Sisters from wrongfully divesting him of the estate that he had spent his life accumulating.  From the issuance of the Provisional Amparo on April 12, 2021 through the present, however, the Sisters have used their status as purported "administrators" of Pamasa and Agrícola El Amate to pillage the entities' assets and transfer them to entities under their control—despite the Provisional Amparo's explicit restrictions on transferring assets other than for tax purposes. This conduct includes the Sisters' attempts to seize the BSI account at issue, and their illegal takeover of Valores Guatemaltecos S.A., the majority stake of which is Pamasa's most valuable asset. *See id.* at ¶¶ 41, 45–46.

The year before he died, on August 18, 2021, Francisco Sr. amended his will to disinherit the Sisters and to designate Francisco Jr. as his sole heir (the "Amended Will"). *Id.* at ¶ 47. Francisco Sr.'s Amended Will specified the Sisters' disinheritance specifically because of the fraudulent Amparo Proceeding, and the Sisters' ongoing scheme "to take possession of his estate." *Id.* Contemporaneously, Francisco Sr. took out a paid advertisement in a prominent, national Guatemalan newspaper, confirming the disinheritance, and decrying their fraudulent efforts. *Id.* at ¶ 49. Sadly, the Sisters' disinheritance further emboldened them: in August and September 2021, they transferred corporate assets to several Panamanian shell entities, including shares in Pamasa

6

and Valores Guatemaltecos, and real estate owned by the entities. *Id.* at ¶¶ 51–53. Their purpose was to place Francisco Sr.'s estate beyond the reach of Guatemalan succession law. *Id.* at ¶ 50.

Francisco Sr. died on July 10, 2022. *Id.* at ¶ 60. Under the Amended Will, Francisco Jr. was to inherit all of his property, including his 1% shareholdings in each of Pamasa and Agrícola El Amate, among other assets in the estate. *Id.* Although the Sisters filed legal proceedings in Guatemala to annul the Amended Will—in which they acknowledged they had been expressly disinherited—those attempts failed. *Id.* In November 2024, Francisco Jr. was appointed executor of his father's estate, and in March 2025, a public notarial declaration of universal heir to his father's estate was issued. *Id.*; *see also id.* at Exs. 5 and 6.  Francisco Jr. is his father's universal heir as a matter of Guatemalan law.

Despite the Constitutional Court's ruling that the Amparo was provisional in nature (*id.* at ¶ 57; *see also id.* at Ex. 4), the Sisters have used their temporary authority to hijack  the entities, although they are not shareholders and were disinherited. *Id.* at ¶ 62. Specifically, because of the entities' cross-ownership structure, under which each entity owns 99% of the other entity, the Sisters' purported managerial control over each entity has allowed them to exercise absolute voting power on behalf of each company, even though they are not shareholders. *Id.* Using this control, in December 2022 and January 2024, the Sisters convened General Shareholders' Meetings for the entities—without proper notice as required under Guatemalan law—to ratify their takeover, thus entrenching themselves as the managers and legal representatives of the entities. *Id.* at ¶¶ 63–64.

Meanwhile, notwithstanding the Sisters' false characterization of the Constitutional Court's ruling, neither the Constitutional Court, nor any other court in Guatemala or elsewhere, has made any factual findings against Francisco Jr. (or his father), much less determined who is entitled to be the "definitive representatives" of the companies.

**The Sisters' Motion to Dismiss**

The Sisters' Motion asks the Court to simply ignore these well-pleaded allegations. Indeed, the Sisters ask the Court to short-circuit this case, and to enter judgment in their favor because Guatemala's Commercial Registry happens to reflect that they are the companies' managers—all while evading the threshold, fundamental question of *how* they came to be the managers in the first place. Because that story is disastrous for the Sisters, in their Motion, they take a kitchen-sink approach, lobbing over a dozen issues to discourage the Court from scrutinizing the provenance of the Sisters' purported "control." The Court should reject each of these arguments.

7

*First*, the Amparo does not "estop" Francisco Jr. from asserting his claims in this case. Tellingly, the Sisters do not even address the gateway issue of comity. Under comity principles, the Court should decline to recognize the Amparo because, among other reasons: Francisco Jr. has credibly alleged that the Sisters procured the Amparo through fraud and collusion; because there is credible evidence that the Guatemalan judiciary lacks impartiality, both systematically, and in the specific case of the tainted Amparo Proceeding here; and because the Amparo Proceeding lacked basic due process protections. Indeed, there is an active criminal case against the judge who issued the Provisional Amparo, for his misconduct in the Amparo Proceeding. Regardless, even if the Court were to recognize the Amparo, that purported judgment does not have any preclusive effect here. Guatemalan law—which controls the issue of preclusion—expressly provides that amparo proceedings *do not* have preclusive effect. This is dispositive.

*Second*, the Court has subject matter jurisdiction over Francisco Jr.'s Crossclaim and personal jurisdiction over the Sisters. The Sisters seemingly fail to realize that the main federal claim that Francisco Jr.'s Crossclaim supplements, for the purposes of supplemental jurisdiction, is **BSI's** Interpleader Counterclaim, *not* the Sisters' Crossclaim. Because BSI's Interpleader Counterclaim relates specifically to a dispute over funds in Pamasa's bank account, and because Francisco Jr.'s Crossclaim alleges that he has an interest in those funds as a result of his former managerial role and current equity ownership in the entities, his Crossclaim forms "part of the same case or controversy" as BSI's Counterclaim. For similar reasons, the Court has personal jurisdiction over the Sisters. In this situation, the test is whether Francisco Jr.'s Crossclaim—which he was compelled to assert in response to BSI's Interpleader Counterclaim to preserve his interest against his Sisters' competing claims—relates to the subject matter of the Sisters' Crossclaim, which they affirmatively filed here. It does: despite the Sisters' self-serving assertion that they consented to jurisdiction only to the issue of "control," they cannot have it both ways and prevent Francisco Jr. from presenting his claims, which *inform* the issue of "control."

*Third*, forum non conveniens does not require the dismissal of the Crossclaim. Guatemala is not an adequate alternative forum: as addressed in detail in the attached export report of Ambassador Gabriel Orellana Rojas, an expert on Guatemalan law, the Guatemalan judiciary—both systematically and in the context of this specific case—lacks guarantees of impartiality or procedural fairness, and thus lacks the safeguards necessary for Guatemala to be deemed an adequate forum. The private and public interest factors also weigh decisively in favor of keeping

8

this case in Florida. Most notably, it was the **Sisters** who initiated this action against BSI, and who affirmatively sought relief against Francisco Jr. through their Crossclaim, thus vitiating any notion that this Court is an "inconvenient" forum for the resolution of interrelated issues.

**Finally**, Francisco Jr. has alleged that the Sisters orchestrated a multi-year scheme to oust him from his role in the entities, and to deprive him of his inheritance, including the proceeds of the BSI account at issue here. He is also the judicially appointed executor of his father's estate (with an interest in marshalling estate assets, including the account funds) and his father's sole and universal heir (with an interest in protecting the assets that make up his inheritance). These allegations are sufficient to show that Francisco Jr. has standing in all of these capacities—i.e., as an ousted administrator, as executor, and as sole heir. The Sisters' Rule 12(b)(6) arguments also fail, as Francisco Jr. has sufficiently alleged tort claims under Guatemalan law.

**ARGUMENT**

## I.   THIS CASE IS NOT LIMITED TO THE NARROW ISSUE OF "CONTROL"

At the outset, the Sisters make several misrepresentations about the scope of this dispute. *See* Mot. at 4–6. For example, despite the backdrop of Francisco Jr.'s allegations regarding their years-long scheme to defraud him and their late father, the Sisters have the temerity to argue that "there is no dispute that Barbara and Valerie control Pamasa." *Id.* at 5. Yes, there **is** a dispute.

### A.   The Crossclaim Challenges the Propriety of the Sisters' Purported "Control"

Initially, the Sisters assert that "this case only deals with who controls Pamasa and nothing else." *Id.* at 4 (emphasis omitted). This argument fails for at least five reasons.

First, the Sisters argue that because BSI's Interpleader Counterclaim purportedly "tees up" only the issue of "control," Francisco Jr. is prohibited from raising any claims or issues beyond the Sisters' self-styled theory of "control." *Id.* This argument fails, most notably, because BSI's Interpleader Counterclaim is not limited to the issue of "control" at all. As is manifest from the face of that pleading, although the Interpleader Counterclaim alleges that there is a dispute "concerning control of Pamasa and thus the Account" (D.E. 12 at ¶ 13), the Counterclaim repeatedly describes the genesis of that dispute: i.e., the Sisters' takeover of Pamasa and Agrícola El Amate as a result of the Amparo. *See id.* at ¶¶ 14–27. Moreover, even if BSI's Interpleader Counterclaim had not detailed the genesis of the parties' dispute, the Sisters' position ignores that Francisco Jr.'s Crossclaim now directly challenges the **propriety** of the Sisters' asserted "control." *See, e.g.*, Crossclaim at ¶ 93. Accordingly, despite the Sisters' efforts to reframe this case to avoid

9

scrutiny over the provenance of their "control," the Court simply cannot determine the propriety of that control without first resolving the threshold issues that Francisco Jr. has raised.

Second, in a legal filing, the Sisters have admitted that their father was the "sole owner" of Pamasa, and that it only existed to manage his assets. *Id.* at ¶ 35; Case No. 1:25-cv-22315-Bloom, D.E. 1, Complaint, at ¶ 7. This alone nullifies their theory of "control."

Third, the Court's comments at the November 4, 2025 status conference—prior to the parties' Crossclaims even being filed—do not prohibit Francisco Jr. from asserting his claims. *See* Mot. at 4. It is the pleadings that control the scope of the case. *See, e.g.*, *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 2010 WL 11508728, at *3 (M.D. Fla. May 5, 2010).

Fourth, in a stunning example of their lack of self-awareness, the Sisters argue that the purported "complexity" of the Crossclaim weighs in favor of preventing Francisco Jr. from asserting it at all. *See* Mot. at 4. The Sisters cite no authority for the assertion that the mere alleged complexity of a claim is relevant to a party's ability to assert it. Instead, invoking the alleged "fast track" schedule for this case, the Sisters claim that the "elaborate" nature of the Crossclaim— involving Guatemalan parties, witnesses, evidence, court proceedings, and assets—weighs against permitting Francisco Jr. to prosecute his case. *Id.* But this unsupported argument rings insincere, as it is the **Sisters** who repeatedly invoke Guatemalan law and court proceedings to bolster their own claims of purported "control" over Pamasa. *See, e.g.*, Sisters' Crossclaim (D.E. 22) at ¶¶ 1– 3, 19; Mot. at 5–6; *id.* at 6–11. These alleged complexities are not a basis for dismissal.

Finally, throughout the Motion, the Sisters chide Francisco Jr. for allegedly "confus[ing] control and ownership." Mot. at 2 (emphasis omitted). It is the Sisters' illogical theory of "control," however, that would violate fundamental principles of corporate law. The Sisters appear to posit that those in "control" of a Guatemalan corporation have the authority to direct the disposition of its assets with impunity. *See id.* (positing that "ownership is irrelevant as to who controls a corporation" (emphasis omitted)); *id.* at 6. Although Francisco Jr. vehemently disputes this characterization of Guatemalan corporate law, the Sisters' theory ignores the allegations of his Crossclaim showing that Francisco Jr. had "control" of Pamasa as of 2020, in connection with the restructuring of his father's estate. *See, e.g.*, Crossclaim at ¶¶ 18–19. Accordingly, because Francisco Jr. has requested a declaration invalidating and/or refusing to give credence to the fraudulent actions by which the Sisters obtained the purported "control" on which they rely (*see, e.g.*, Crossclaim at ¶ 93), the Sisters are incorrect that his only interest lies in his equity stake.

10

Francisco Jr.'s ownership interest in Pamasa independently vitiates the Sisters' bizarre and inequitable "control" theory. As an initial matter, the Crossclaim alleges that, under the Amended Will, Francisco Jr. is his father's sole heir, entitled to receive the ***entirety*** of his father's estate. *E.g.*, Crossclaim at ¶¶ 47, 49, 60. The Sisters have already admitted that Francisco Sr. was the sole owner of Pamasa.  Thus, irrespective of the entities' cross-ownership structure, because Francisco Sr. was the ultimate beneficial owner of the assets of Pamasa and Agrícola El Amate (*see id.* at ¶¶ 22–23), Francisco Jr. is now entitled to receive those assets under the Amended Will, and he is entitled to marshal those assets as the judicially appointed executor of the estate. And even if the Court were to accept the Sisters' position that Francisco Jr. is merely a 1% shareholder in Pamasa by operation of the entities' structure (*see, e.g.*, Mot. at 2, 6), it would not follow that they could dispose of the assets of Pamasa, an entity in which they indisputably do ***not*** have an ownership interest, as they wish. As purported administrators of the company, they have a fiduciary duty to manage Pamasa's assets in the best interests of its shareholders. *See* Orellana Rep. at 14–16.[3]

In short, the Sisters' "control" theory is an inelegant effort to justify their corporate raid. Because they cannot explicitly tell the Court that they want "control" over Pamasa so that they can continue to siphon assets to themselves (*see, e.g.*, Crossclaim at ¶¶ 50–53), they focus on a manufactured distinction between "control" and "ownership" to seek a quick-and-dirty resolution of this case. Under either conception—i.e., as an ousted administrator of Pamasa, as the company's ultimate beneficial owner and the sole heir of his father's entire estate, and as the executor of the estate—Francisco Jr. has the right to challenge the Sisters' purported "control."

## B. The Anleu Report Is Inapposite to the Sisters' Dismissal Arguments

In furtherance of their quest to short-circuit this case, in the Motion, the Sisters rely on the expert report of Gerardo Anleu, who the Sisters say is a Guatemalan law expert. Mot. at 5–6; D.E. 32-1. The Anleu Report opines that, because Guatemala's Commercial Registry reflects that Barbara and Valerie were respectively appointed as "Sole Administrator" and "General Manager"

---

[3] The Sisters cite *McVay* for the proposition that "assets of a company belong to the company, not its shareholders or owners." Mot. at 4–5. There, the court reaffirmed the general principle that a "corporation is a separate, legally recognized entity that holds title to its assets." *Dr. Rooter Supply & Serv. v. McVay*, 226 So. 3d 1068, 1072 (Fla. 5th DCA 2017). The court immediately thereafter observed, however, that individual shareholders have an interest in the corporation's assets, i.e., when corporate assets are distributed as payment "for services or as dividends." *Id.* at 1073 (internal quotation marks omitted). Accordingly, especially in the case of single-shareholder corporations such as Pamasa, *McVay* ***confirms*** that shareholders do, in fact, have a direct interest in the corporation's assets.

11

of Pamasa, the Sisters "control" Pamasa and are therefore entitled to "act on behalf of the company" as they fancy, apparently even against the interests of Pamasa's ultimate beneficial owner, Francisco Jr. *See* Mot. at 5–6; Anleu Rep. at ¶¶ 21, 23, 25, 26. Again, contrary to the Sisters' contention that "under Guatemalan law, shareholders cannot control a corporation by virtue of their status as shareholder" (Mot. at 5), consistent with fundamental principles of corporate law and of common sense, Guatemalan law provides that **shareholders** have the right to dictate the corporation's affairs, while administrators have the duty to administer the corporation for the shareholders' benefit. *See* Orellana Rep. at 14–16. The notion that the owners of a corporation are expected to sit idly by while rogue administrators pillage company assets flies in the face of logic.

Regardless, the tautological Anleu Report is entirely duplicative of, and goes only to the merits of, the Sisters' Crossclaim. *Compare, e.g.*, Anleu Report at ¶¶ 21, 23, 25, 26, *with* Sisters' Crossclaim at ¶¶ 2–3. Because the Report is inapposite to any arguments raised in the Motion, the Court should strike it. *See, e.g.*, *Jannazzo v. United States*, 2016 WL 1452392, at *4 (S.D.N.Y. Apr. 13, 2016); *Sherman ex rel. Sherman v. Helms*, 80 F. Supp. 2d 1365, 1368 (M.D. Ga. 2000).[4]

## II.  THE AMPARO DOES NOT HAVE PRECLUSIVE EFFECT

The Sisters next argue that the Amparo has preclusive effect. Mot. at 6–11. Emblematic of their effort to deflect attention from dubious foreign legal proceedings, the Sisters fail to address the gateway issue of comity—which should compel the Court not to recognize the Amparo at all.

### A.  Legal Standard

When, as here, a party asserts that foreign legal proceedings have preclusive effect, the Court applies a two-part test. First, the Court addresses whether the foreign judgment is entitled to recognition under the principles of comity. If so, the Court then addresses whether the requirements of preclusion are satisfied. *See, e.g.*, *King v. Cessna Aircraft Co.*, 2010 WL 5253526, at *6 (S.D. Fla. Sept. 13, 2010); *In re Ortega T.*, 573 B.R. 284, 291 (Bankr. S.D. Fla. 2017).

### B.  The Court Should Decline to Recognize the Amparo Under Comity

At the outset, principles of comity should foreclose recognition of the Amparo.  Although "American courts will normally accord considerable deference to foreign adjudications as a matter

---

[4] Conversely, the Court can and should consider the entirety of the Orellana Report. Most notably, the Orellana Report provides opinions in connection with Francisco Jr.'s comity, preclusion, and forum non conveniens arguments—opinions that are proper at the dismissal stage. *See, e.g.*, *J.C. Renfroe & Sons, Inc. v. Renfroe Japan Co.*, 515 F. Supp. 2d 1258, 1266 n.6 (M.D. Fla. 2007); *see also* Fed. R. Civ. P. 44.1. Regardless, if the Court considers the Anleu Report, it should consider Orellana's rebuttal opinions.

of comity," *King*, 2010 WL 5173152, at *6, foreign judgments are not self-executing. Indeed, as the Supreme Court has recognized, comity is not "a matter of absolute obligation." *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895). Instead, courts consider three factors to determine whether a foreign judgment is entitled to recognition: "(1) whether the judgment was rendered via fraud"; "(2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence"; and "(3) whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just." *Turner Ent. Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994).[5] Each of these factors—individually, and certainly collectively—requires non-recognition.

**First**, Francisco Jr. has plausibly alleged that the Sisters procured the Amparo based on fraud—i.e., judicial corruption in this specific case. This factor asks "whether a foreign court was acting fraudulently and is a forum so incompetent in its standards that its procedures cannot be squared with the principles underlying the American legal system." *Tr. Int'l Corp. v. Nagy*, 2017 WL 5248425, at *6 (S.D. Fla. Mar. 28, 2017). In excruciating detail, the Crossclaim describes the Sisters' years-long scheme to defraud, beginning in 2018 with the Sisters' fraudulent amendment of the Foundation's bylaws; continuing in 2021 with the filing of the amparo petition in the provincial Santa Lucía Court, a blatantly improper forum; and culminating with the Sisters' ongoing efforts to siphon corporate assets based on the purported "control" they obtained through the Amparo. *See, e.g.*, Crossclaim at ¶¶ 16, 28, 50–53. Notably, the fraudulent nature of the Amparo Proceeding is corroborated by the fact that Judge Umaña, who issued the Provisional Amparo, is now charged in a criminal case for collusion and abuse of authority arising from his conduct in ***this very case***—exposure that extends to the lawyers who filed the Amparo and other judicial actors involved. *Id.* at ¶ 67; Orellana Rep. at 9–13 (detailing the irregularities with the proceedings and opining, "[t]he collective circumstances should raise alarm bells in any court assessing the legitimacy of the amparo proceedings and any rights that are being asserted pursuant to these proceedings"). The allegations suffice to show that the Amparo was the result of corruption and collusion and, thus, "rendered via fraud." *See, e.g.*, *Commissions Imp. Exp. S.A. v. Republic of Congo*, 2015 WL 13667748, at *2 (D.D.C. July 6, 2015) (declining to recognize Congolese orders

---

[5] Because BSI's Interpleader Counterclaim alleges that the Court's subject matter jurisdiction is based, in part, on a federal question (D.E. 12 at ¶ 7), federal law governs comity. *See, e.g.*, *Pony Express Recs., Inc. v. Springsteen*, 163 F. Supp. 465, 472 (D.N.J. 2001). Even if state law applied, the result would be the same, as it recognizes similar principles. *Nahar v. Nahar*, 656 So. 2d 225, 229 (Fla. 3d DCA 1995).

13

that forced the plaintiff into liquidation, and which gave liquidation trustees "'sole legal authority,'" because they "were the result of highly questionable, and perhaps even fraudulent, proceedings"); *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 287 (S.D.N.Y. 1999), *aff'd*, 201 F.3d 134 (2d Cir. 2000) (a Liberian judgment was "unenforceable as a matter of law" because the "Liberian judicial system was not fair and impartial," including because "[t]he due process rights of litigants were often ignored, as corruption and incompetent handling of cases were prevalent"); *In re Perry H. Koplik & Sons, Inc.*, 357 B.R. 231, 244 (Bankr. S.D.N.Y. 2006) (similar).

*Second*, Francisco Jr. has shown systemic corruption in the Guatemalan judicial system. Ambassador Orellana opines about the ongoing "crisis" in Guatemala's judicial system, where "litigants cannot always reliably expect proceedings to be conducted with impartiality and procedural fairness." Orellana Rep. at 6–7. Indeed, in addressing the recognition of foreign judgments under comity, courts have held that allegations of systemic corruption—rather than allegations of individualized corruption in a particular case—could be sufficient for non-recognition. *See, e.g.*, *In re Perry H. Koplik*, 357 B.R. at 244; *Bridgeway Corp.*, 45 F. Supp. at 286–88. As alleged in the Crossclaim, on December 1, 2025, the Inter-American Commission on Human Rights published an extensive report, concluding, among other things, that "[t]he manipulation of the judicial system represents one of the greatest threats to democratic stability in Guatemala," given the "instrumentalization" of the justice system by rogue actors. Crossclaim at ¶ 66. Accordingly, even without evidence of specific corruption, this systemic malfeasance requires non-recognition. *See In re Perry H. Koplik*, 357 B.R. at 243.

*Third*, and finally, the Amparo Proceeding violates American public policy. *Turner Ent. Co.*, 25 F.3d at 1519. Critically, "[n]otice is an element of our notion of due process and the United States will not enforce a judgment obtained without the bare minimum requirements of notice." *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana*, 347 F.3d 589, 594 (5th Cir. 2003). As detailed above, the Amparo Proceeding lacked any semblance of even the most basic conceptions of due process: Valerie filed an untimely amparo petition in a provincial court with no nexus to the dispute; it was based on nonsensical allegations that were already moot; she was not authorized to act on behalf of Pamasa at the time; neither Francisco Sr. nor Francisco Jr. was given notice of the proceedings so that they could timely respond; the Provisional Amparo, although nominally a provisional measure, was facially indefinite; and when Francisco Sr. and Francisco Jr. heard of the proceedings informally and attempted to respond, Judge Umaña refused

14

to consider their submissions outright. These flagrant due process violations compel non-recognition. *See, e.g.*, *Int'l Transactions, Ltd.*, 347 F.3d at 596 (court abused its discretion in recognizing a foreign judgment, when the resisting party did not have "an opportunity to be heard in the Mexican court on the issues underlying" the judgment); *Remington Rand Corp.-Delaware v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266–67 (3d Cir. 1987); *Corporacion Salvadorena de Calzado, S.A. (Corsal, S.A.) v. Injection Footwear Corp.*, 533 F. Supp. 290, 298 (S.D. Fla. 1982).

Setting aside any ***notice*** deficiencies, U.S. and Florida public policy strongly disfavor confiscatory reallocations of property achieved without basic procedural safeguards. That is what happened here: Francisco Jr. was ousted from his corporate position and stripped of his expected inheritance—all without any factual findings as to what, if anything, warranted that outcome.

### C. The Amparo Does Not Have Claim- or Issue-Preclusive Effect

Regardless, the Amparo does not have preclusive effect here. Mot. at 6–11.

#### 1. The Amparo does not have preclusive effect under Guatemalan law.

Because the Amparo is a Guatemalan judicial decree, Guatemalan law governs its preclusive effect. *See, e.g.*, *King*, 2010 WL 5253526, at *7; *see also, e.g.*, *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1509 (11th Cir. 1985). Guatemalan law expressly provides that amparo proceedings do ***not*** have preclusive effect. As explained in the Orellana Report, Article 190 of Guatemala's Amparo Law provides, in relevant part, that amparo judgments "***do not produce the defense of res judicata***, without affecting what is established regarding constitutional precedent in amparo matters." Orellana Rep. at 13 (emphasis added). As Ambassador Orellana notes, this "follows logically" because "amparos are by their nature non-final," and are "designed to be a fast-track, highly situational constitutional safeguard." *Id.* The Amparo's non-preclusive effect is further confirmed by the Constitutional Court's ruling, which explicitly contemplated that it was non-final (i.e., provisional): It explicitly wrote that its decision would be "subject to" the "final judicial decisions . . . that must be promoted in the ordinary jurisdiction" to determine "control" over Pamasa. Crossclaim at ¶¶ 55–57; *id.* at Ex. 4.

#### 2. The Amparo does not have claim-preclusive effect under US law.

Even if the Court were to analyze the preclusive effect of the Amparo under US law—which, as noted, is inapposite to this issue—the same result follows because the Sisters cannot satisfy the elements of finality and identity of claims.

First, for the purposes of claim preclusion, a "'final order is one that ends the litigation on the merits and leaves nothing for the court to do but execute its judgment.'" *Hickman v. Facebook/Meta*, 2025 WL 1370027, at *3 (S.D. Fla. May 12, 2025); *see also, e.g.*, *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 823, 829 (11th Cir. 2010) (same). The Sisters cannot meet that standard. The Sisters say that, in the Amparo Proceeding, "the issue of control of Pamasa was litigated," and that "the Guatemalan courts have spoken with finality on the identity of Pamasa's legal representatives." Mot. at 7–8. No, they haven't. Because of the nature of an amparo proceeding—i.e., an expedited proceeding directed to the preservation of the petitioner's constitutional rights—there would have been no occasion, and there **has been no occasion**, for the Guatemalan courts to finally resolve the issue of "control." Instead, as Orellana explains:

> Although it might feel unusual from a United States litigation perspective, an amparo court can grant relief if it concludes that a right is being *threatened*, but the court does not first need to resolve factual disputes in order to do so, nor does it need to make any finding or threshold determination that the allegations underlying the amparo petition even had any merit. Amparos often are not merits-based adjudications, *at all*, but instead focus on the constitutional risks and the legal consequences of the challenged act. What makes amparos all the more unusual when comparing them to U.S. litigation is that—notwithstanding the (in some cases) lack of traditional 'factual findings'—the protective ruling *is* the final product of the proceeding; in other words, there is not necessarily a merits stage of the case in which findings are made.

Orellana Rep. at 13–14 (emphasis in original). Accordingly, consistent with the nature of an amparo proceeding, no court has ever made factual findings against Francisco Jr. at all, either in connection with the Amparo, and much less concerning the issues of "control" relevant to this case. Even if the Amparo **had** made such findings, they wouldn't have preclusive effect here, because the Amparo was by its nature a provisional ruling—not a "final" order. *Cf. Elec. Design & Mfg. Inc. v. Konopka*, 649 N.E.2d 619, 623 (Ill. App. Ct. 1995) (explaining that factual findings under a preliminary injunction "do not carry with them the preclusive effect of *res judicata*," because "unlike a trial on the merits," such proceedings involve "an abbreviated evidentiary hearing on an emergency basis"); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 38 F. Supp. 3d 1365, 1369 (N.D. Ga. 2014), *aff'd,* 788 F.3d 1318 (11th Cir. 2015) (similar).

The Sisters also argue that, because the Provisional Amparo provided for their temporary appointment as Pamasa's legal representatives, and because they were thereafter able to hijack the company by orchestrating a permanent takeover, the issue of "control" has been finalized. *See* Mot. at 8. That position is not, and cannot be, right. Indeed, this bizarre position not only ignores the allegations of Francisco Jr.'s Crossclaim, which alleges that the Sisters' permanent takeover

16

of the entities was part of their fraudulent scheme and, thus, invalid. *See, e.g.*, Crossclaim at ¶¶ 62–65. It also ignores the Constitutional Court's ruling, which explicitly acknowledged that the issue of "control" would be decided not by the Sisters' unilateral action, but by further judicial proceedings—i.e., a trial on the merits regarding "control." *Id.* at Ex. 4; *see also* Orellana Rep. at 14. Of course, because no such trial has occurred, there is no final adjudication of "control."

Second, the Amparo Proceeding and this case involve different causes of action. This factor requires "a consideration of the facts and legal theories of two causes of action as well as the rights and duties involved in each case." *Draper v. Atlanta Indep. Sch. Sys.*, 377 F. App'x 937, 940 (11th Cir. 2010). Only "when the substance and facts of each action are the same" will claim preclusion bar the successive suit. *Id.* Here, the Amparo Proceeding decided a narrow issue: whether the Sisters sufficiently alleged a potential violation of their constitutional rights to justify the *ex parte* issuance of provisional relief. *See* Orellana Rep. at 7–9. Again, under both Guatemalan statutory law and the Constitutional Court's ruling, the Amparo was not a final determination of "control." And even if the Provisional Amparo ***was*** a final order as to the sole issue it decided, that would be of no moment, as Francisco Jr.'s Crossclaim raises different facts and legal theories: i.e., that the basis of the Amparo Proceeding was fraudulent to begin with, as the Sisters instituted that proceeding to unlawfully oust him and his father from Pamasa. *See, e.g.*, *Drummond Co. v. Dir., OWCP*, 586 F. App'x 541, 544 (11th Cir. 2014); *F.T.C. v. Wilcox*, 926 F. Supp. 1091, 1102 (S.D. Fla. 1995); *Cervantes v. Atkinson*, 2015 WL 6504599, at *3 (S.D. Fla. Oct. 28, 2015).

### 3.  The Amparo does not have issue-preclusive effect, either.

Nor does the Amparo have issue-preclusive effect. *See* Mot. at 10–11; *see also Madura v. Bank of Am.*, 767 F. App'x 868, 871 (11th Cir. 2019). At the outset, although "the finality requirement is less stringent for issue preclusion than for claim preclusion," issue preclusion still requires a ***final*** judgment: i.e., "'any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.'" *Christo v. Padgett*, 223 F.3d 1324, 1339 n.47 (11th Cir. 2000). For all of the reasons fully briefed above, the Amparo is not a "final" adjudication of the issue of "control," or even of the narrow issue that it decided.

The Sisters also fail to establish any element of issue preclusion. Again, the Sisters repeat the canard that the Constitutional Court finally decided the issue of "control." *See* Mot. at 10–11. In doing so, they ignore (1) that Francisco Jr. was in a purely defensive posture in the Amparo Proceeding; (2) that the Amparo Proceeding addressed the narrow question of whether the Sisters

had alleged a sufficient basis for provisional relief, and the Amparo provided **only** that narrow relief; and (3) that the Constitutional Court acknowledged that the Amparo was provisional and that "control" would be decided in due course. Francisco Jr. has never "actually litigated," and no court has ever ruled upon, his claims. There is no issue preclusion. *See, e.g.*, *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1318 (11th Cir. 2003); *Fla. Transportation Serv., Inc. v. Miami-Dade Cnty.*, 2006 WL 8432680, at *3 (S.D. Fla. June 1, 2006). Conversely, the Sisters' cases involve situations in which the resisting parties had actually and fully litigated.

## III. <u>FRANCISCO JR. HAS NOT IMPROPERLY "SPLIT" HIS CLAIMS</u>

Invoking supposed "probate proceedings in Guatemala" in which Francisco Jr. has purportedly asserted similar claims, the Sisters next argue that the "claims-splitting doctrine" bars his claims. Mot. at 11–12. There are several issues with this argument.

First, and most notably, there is no parallel proceeding for which the claim-splitting doctrine could potentially apply. The Sisters claim that "[t]his action, where Francisco Jr. claims to be 'the sole heir and beneficiary' of his father, is not new and independent of the pending probate claims in Guatemala." *Id.* at 12. But there is no **pending** probate proceeding; Francisco Jr. has already been deemed his father's universal heir.  And in any event, Francisco Jr. did not, **and could not have**, raised fraud, tortious interference, and declaratory judgment claims in a Guatemalan probate forum. *See* Orellana Rep. at 17–18.  This is fatal to the Sisters' claim-splitting argument. *See, e.g.*, *Anderson v. State of Idaho*, 2026 WL 309598, at *4 (D. Idaho Feb. 5, 2026) (holding that claim-splitting did not apply because "[t]here [were] no longer parallel cases").[6]

Even if Francisco Jr. had filed similar claims in Guatemalan probate court, the application of claim-splitting would be silly here given that the Sisters foisted this action upon him in this Court. Francisco Jr. therefore cannot be stymied from defending himself here, and from asserting his claims, which arise directly from the Sisters' claims. *See Dominguez Fam. Enters., Inc. v. Juanita's Foods*, 2023 WL 4157477, at *3 (C.D. Cal. May 19, 2023).

## IV. <u>THE COURT HAS JURISDICTION OVER FRANCISCO JR.'S CROSSCLAIM</u>

The Court should also dispense with the Sisters' jurisdictional arguments. Mot. at 12–14.

### A. The Court Has Subject Matter Jurisdiction Over the Crossclaim

---

[6] The claim-splitting doctrine does not apply for another reason: because that doctrine applies only to parallel cases in federal court. *See, e.g.*, *LaBovick & LaBovick, P.A. v. Simovitch*, 2012 WL 920767, at *1 (S.D. Fla. Mar. 19, 2012).

The Sisters' jurisdictional challenge rests on a fundamental misunderstanding of the Rule 22 interpleader and crossclaim framework. It fails for several independent reasons. *First*, the Motion is premised on an incorrect understanding of subject matter jurisdiction in a Rule 22 interpleader action. The absence of diversity among the interpleader defendants does not defeat jurisdiction because, in a Rule 22 interpleader, complete diversity is required only between the stakeholder (BSI) and the claimants—not among the claimants themselves. *Primerica Life Ins. Co. v. Pedrogo*, 2025 WL 3078295, at *1 (M.D. Fla. Nov. 4, 2025).

*Second*, Francisco Jr.'s Crossclaim falls within the Court's jurisdiction under Rule 13(g), which expressly permits crossclaims that arise out of the same transaction or occurrence or that relate to the property that is the subject of the action. In a Rule 22 interpleader, such crossclaims are treated as ancillary for subject matter jurisdiction purposes because Rule 13(g) simply requires that they arise out of the same transaction or relate to the property at issue. *Cherokee Ins. Co. v. Koenenn*, 536 F.2d 585, 588–89 (5th Cir. 1976). The Crossclaim relates directly to entitlement to, and control of, the very funds deposited with the Court.

*Third*, again, the Sisters draw a manufactured distinction between "control" and "ownership." In *Dean Witter Reynolds Inc. v. Fernandez*, the court exercised ancillary jurisdiction over fraud-based claims to interpleaded funds and explained that "it is the ownership or entitlement to possess and control those funds which is at issue." 489 F. Supp. 434, 440 (S.D. Fla. 1979). There, as here, claims sounding in fraud were necessary to determine whether a party's asserted entitlement to the funds was legitimate. Francisco Jr.'s claims do not "expand" the dispute; they *explain* why the Sisters' "control" is invalid and why their claim to the funds fails.[7]

*Fourth*, the Sisters have already *agreed* that this Court retains jurisdiction over disputes between the interpleader defendants relating to control of the account. Paragraph 4 of the Proposed *Agreed* Order of Interpleader (D.E. 12-4) expressly provides that the Court "shall retain jurisdiction over any claims by and between the interpleader defendants relating to control of the Account." Paragraph 6 further requires the parties to "interplead and litigate between themselves their respective rights to the Account." The Sisters cannot now argue that the Court lacks jurisdiction over claims that bear directly on whether their asserted control of the account is legitimate. *See Slater v. United States Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017).

---

[7] In the Court's Order granting BSI's request for Interpleader, the Court framed the dispute between the siblings as one regarding control of the funds in the account. *See* D.E. 18 at ¶ 2.

19

*Finally*, there is no basis to decline supplemental jurisdiction under 28 U.S.C. § 1367(c). The fact that Guatemalan law applies does not render the claims "novel or complex." Federal courts routinely exercise supplemental jurisdiction over claims governed by foreign law. *Jaramillo v. Naranjo*, 2015 WL 10857563, at *5 (S.D. Fla. Sept. 30, 2015). And bare claims that foreign law presents "novel or complex" issues do not warrant declining supplemental jurisdiction. *See Mamani v. Berzain*, 21 F. Supp. 3d 1353, 1378–79 (S.D. Fla. 2014). The claims here involve ordinary tort principles analogous to domestic law and are supported by competent expert testimony. Indeed, the Sisters rely heavily on Guatemalan law to support their own claims.

The fraud claims also do not "predominate" over the interpleader dispute; they inform it. They arise from the same nucleus of operative fact, involve the same actors, witnesses, and evidence, and bear directly on entitlement to the interpleaded funds. Courts reject predominance arguments where state-law claims explain or resolve the federal dispute rather than overwhelm it. *See Denarii Sys., LLC v. Tellez*, 2011 WL 13322664, at *11 (S.D. Fla. Oct. 14, 2011). Here, the alleged fraud does not supplant the interpleader claim; it goes to the core question of whether the Sisters' asserted control—and thus their claim to the funds—can be credited. And scheduling concerns do not constitute "exceptional circumstances" warranting dismissal. The relevant inquiry under § 1367(c)(4) focuses on judicial economy, convenience, fairness, and the avoidance of piecemeal litigation. *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 745–46 (11th Cir. 2006). Requiring Francisco Jr. to litigate his tort claims in a separate forum while this Court adjudicates entitlement to the same funds would undermine those principles.

## B. The Court Has Personal Jurisdiction Over the Sisters

The Sisters assert that because they seek only a "declaration as to control" (Mot. at 14), they did not subject themselves to jurisdiction in Florida to litigate issues relating to our Crossclaim. But that framing collapses under even minimal scrutiny. The Court cannot determine who is entitled to control the funds in the account without examining the basis for the Sisters' purported entitlement. Francisco Jr.'s Crossclaim alleges, in extensive factual detail, that the Sisters' claimed authority derives solely from a provisional foreign order procured through fraud, concealment, jurisdictional manipulation, and judicial irregularities. The validity of that authority is not collateral to the issue of control. It's dispositive of it. The Sisters cannot ask this Court to declare them the lawful controllers of the BSI account while simultaneously preventing Francisco Jr. from litigating whether that claimed control was fraudulently obtained.

20

This threshold reality resolves the personal jurisdiction question. The Court need not engage in a traditional long-arm analysis because the Sisters consented to this Court's jurisdiction when they filed their Complaint and Crossclaim seeking affirmative declaratory relief regarding the Pamasa account. Once a party invokes a federal court's jurisdiction to adjudicate rights concerning specific property, the only relevant inquiry is whether the opposing party's crossclaims arise out of the same transaction or occurrence. If they do, they are compulsory, and personal jurisdiction attaches. The Sisters' reliance on *Edwards v. Johnson* is therefore misplaced; *Edwards* addresses ***permissive*** counterclaims. Mot. at 14. The only question is whether Francisco Jr.'s Crossclaim is logically related to the Sisters' declaratory action concerning the account. It is.

Under Rule 13, a claim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." *Nicopior v. Moshi Moshi Palm Grove, LLC*, 375 F. Supp. 3d 1278, 1285 (S.D. Fla. 2019). Under the Eleventh Circuit's "logical relationship" test, claims are compulsory where they arise from the same aggregate of operative facts, or where the factual predicate of the original claim triggers additional legal rights in the opposing party. *Republic Health Corp. v. Lifemark Hosps. of Fla.*, 755 F.2d 1453, 1455 (11th Cir. 1985). Here, the Sisters' declaratory claim rests on a single premise: that the Amparo validly installed them as Pamasa's administrators (***forever***, supposedly), giving them authority to control the BSI account. Francisco Jr.'s Crossclaim challenges that exact premise for all of the reasons addressed above. The same aggregate of operative facts—the Amparo Proceeding, the Amparo, the representations to BSI, and the assertion of authority over Pamasa—underlies each party's claims. Moreover, claims are compulsory where, as here, they offer an alternative explanation for the conduct at issue and/or contest its legal significance. *See Jagroop v. Moran Foods, LLC*, 2014 WL 12600721, at *2–*3 (S.D. Fla. Mar. 4, 2014) (fraud and theft counterclaims were compulsory to an employee's FLSA claim because the employer's counterclaims provided an alternative explanation for the conduct underlying the plaintiff's claim); *John Alden Life Ins. Co. v. Cavendes*, 591 F. Supp. 362, 365–67 (S.D. Fla. 1984) (claim challenging the validity of a written agreement on fraud grounds was a compulsory counterclaim to a claim seeking enforcement of the agreement). As long as the claims arise from the same aggregative of operative facts, a claim is compulsory even if it involves additional allegations that do not require identical proof. *See Revere Copper & Brass, Inc. v. Aetna Casualty & Surety Co.*, 426 F.2d 709, 715 (5th Cir. 1970).

21

The interpleader context makes the relationship even clearer. In actions concerning entitlement to specific funds, crossclaims challenging the legitimacy of a claimant's asserted right to the res are logically related and properly adjudicated together. *See United States v. All Right, Title & Interest*, 1996 WL 695671, at *11–*12 (S.D.N.Y. Dec. 5, 1996) (permitting crossclaims in forfeiture action where alleged broader fraud was "an integral part of the chronological background" underlying competing claims to the funds). The alleged fraud surrounding the Amparo Proceeding is not peripheral; it is the chronological and legal foundation of the Sisters' asserted control.

In sum, the Sisters consented to jurisdiction when they sought affirmative relief here.

## V.   FORUM NON CONVENIENS DOES NOT REQUIRE DISMISSAL

Nor does the doctrine of forum non conveniens require dismissal. Mot. at 14–16. The Sisters have failed to satisfy their burden as to any of the relevant factors, much less all of them. *See Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001).

***First***, for the same reasons that the Amparo is not entitled to recognition under comity (*see* Argument, Section II.B., above), Guatemala is not an adequate alternative forum for the prosecution of Francisco Jr.'s claims. The Sisters concede that "significant evidence" of "serious corruption or delay" could render the alternative forum inadequate. *See* Mot. at 15 (quoting *Leon*, 251 F.3d at 1312) (internal quotation marks omitted). But the Sisters say that Francisco Jr. "has offered no significant evidence of serious corruption in Guatemala." *Id.* Yes, he has. And the Court need not take our corruption claims at face value: with respect to Judge Umaña, the Guatemalan Supreme Court of Justice independently analyzed the allegations of misconduct against the judge and lifted the presumption of judicial immunity, thus allowing for a criminal action into his potential corruption in this case. Crossclaim at ¶ 67. On January 29, 2025, the Constitutional Court upheld the Supreme Court's ruling, and as a result criminal proceedings against Judge Umaña are proceeding without constitutional impediment. *See* Orellana Rep. at 13.

Francisco Jr. has also presented compelling evidence of systemic corruption in the Guatemalan judiciary. *See* Argument, Section II.B., above. Either ground is sufficient to show the inadequacy of the Guatemalan courts. This is the exact conclusion that the Court has reached upon substantively identical allegations. *See Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1085–86 (S.D. Fla. 1997); *see also id.* at 1086; Crossclaim at ¶ 66.

22

*Second*, the Sisters do not even address the private interest factors, which is a waiver of this issue. *See, e.g.*, *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989). In any event, the private interest factors do not weigh in favor of dismissal, as the relevant parties, and thus the relevant evidence, are before the Court as a result of the Sisters' own claims.

The public interest factors also do not favor dismissal. As discussed further below, Francisco Jr. agrees that Guatemalan law governs his tort claims. *See* Mot. at 15. The application of foreign law, however, is not a sufficient basis for dismissal, as the Court is perfectly capable of applying foreign law—and routinely does so. *See SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1104–05 (11th Cir. 2005); *Sun Tr. Bank v. Sun Int'l Hotels, Ltd.*, 184 F. Supp. 2d 1246, 1266 (S.D. Fla. 2011). Moreover, as detailed in the Orellana Report, there is nothing particularly complex about Guatemalan tort law, which substantially mirrors domestic tort principles. And the Sisters rely heavily on Guatemalan law in support of their *own* claims, proving that Guatemalan law will feature heavily in the case regardless. The Sisters assert that the purportedly "'massive'" scope of the Crossclaim favors dismissal (Mot. at 15–16), but they ignore that the issues underlying the Crossclaim will need to be litigated here regardless, as Francisco Jr. has asserted affirmative defenses that substantively overlap with his claims. *See* D.E. 29 at 5–7.

*Third*, the Sisters misapprehend the third factor: whether Francisco Jr. can maintain his claims in Guatemala without undue prejudice or inconvenience. *See* Mot. at 16. This factor focuses on whether the Sisters would submit to the jurisdiction of the Guatemalan courts for Francisco Jr.'s specific claims, and waive any jurisdictional or timeliness defenses to those claims. *See McLane v. Marriott Int'l, Inc.*, 960 F. Supp. 2d 1351, 1362 (S.D. Fla.), *aff'd,* 547 F. App'x 950 (11th Cir. 2013). Notably absent from the Sisters' Motion is any express submission to the Guatemalan courts' jurisdiction, which is what is required. *See id.* The reason for this must be obvious by now: the Sisters don't want to litigate Francisco Jr.'s claims anywhere, at all, and instead want the Court to fast-track their own claims to judgment.

*Fourth*, and finally, neither the doctrine of forum non conveniens, nor comity, requires the Court to defer to purported proceedings in Guatemalan probate court. *See* Mot. at 16–17. As fully addressed above, there are no live, parallel proceedings in Guatemalan probate court.  Even if there were, as Ambassador Orellana explains in his Report, "Guatemala's probate forum is structurally incapable of resolving the claims being asserted" here, as "[s]uccession courts in Guatemala determine heirship and administer estate distribution; they generally do not adjudicate third-party

23

fraud claims, even if they involve assets that are alleged to be part of the estate." Orellana Rep. at 17–18.  Again, the Sisters affirmatively sought relief in this Court.

## VI. <u>FRANCISCO JR. HAS SUFFICIENTLY ALLEGED STANDING</u>

The Sisters recast Francisco Jr.'s injury as a speculative, future inheritance dispute—i.e., that he "feels entitled" to the funds as a future heir once probate concludes. That is not what the Crossclaim alleges. The pleaded injury is not a conjectural probate expectancy. It is the present, concrete deprivation of corporate office, governance authority, and control over assets that Francisco Jr. previously exercised and would continue to exercise but for the Sisters' fraudulent scheme, which has enabled them to pilfer those assets for their own benefit. There is standing.

The Sisters correctly recite that Article III requires a concrete and particularized injury that is actual or imminent—one that is real, not abstract. *Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110, 1113 (11th Cir. 2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). But their analysis stops where the Court's doesn't. Concrete does not mean tangible; intangible injuries suffice. *Id.*; *see also Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1242–43 (11th Cir. 2022) (en banc) (recognizing that although financial loss is paradigmatic, intangible harms can also qualify). And at the motion to dismiss stage, general factual allegations of injury resulting from a defendant's conduct are sufficient. *Coker v. Warren*, 660 F. Supp. 3d 1308, 1318 (M.D. Fla. 2023), *aff'd,* 2025 WL 1575578 (11th Cir. June 4, 2025); *see also Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treasury*, 773 F.3d 243, 245 (11th Cir. 2014).

The Crossclaim meets that standard. Francisco Jr. alleges that he was serving as vice president and legal representative of Pamasa and Agrícola El Amate; that the Sisters procured his provisional suspension through fraud and judicial collusion; and that, as a result, he was ousted from those positions and stripped of decision-making authority over the entities and their assets. He further alleges that the Sisters have used their fraudulently obtained authority to assert exclusive control over Pamasa and the BSI account, and that BSI has denied his access in reliance on the Sisters' misrepresentations. He alleges actual, present harm in the form of his ouster from corporate leadership—depriving him of control over Pamasa and Agrícola El Amate and, as a direct consequence, authority over the BSI account and the funds held therein, while the Sisters exercise that fraudulently obtained control to pillage those same funds.

Federal courts have repeatedly recognized that loss of governance rights and operational control constitutes a constitutional injury. In *Walt Disney Parks & Resorts U.S., Inc. v. DeSantis*,

716 F. Supp. 3d 1216, 1222 (N.D. Fla. 2024), the court held that Disney's loss of voting rights and control over the governing board regulating its property was "enough to constitute a constitutional injury"—before the challenged action, Disney exercised governance authority; afterward, it did not. *See also Jacobson v. Florida Secretary of State*, 974 F.3d 1236, 1246 (11th Cir. 2020); *Braman Motors, Inc. v. BMW of North America, LLC*, 2022 WL 1111028, at *7 (S.D. Fla. Feb. 11, 2022). The common thread is clear: when a party is stripped of voting power, governance authority, or operational control, the resulting loss of control is concrete harm. Francisco Jr. alleges precisely that—his removal from corporate leadership and the loss of control over Pamasa and the account.

The Sisters attempt to avoid this conclusion by reframing the injury as a speculative future probate shortfall, but Article III requires only that the plaintiff himself be among the injured. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992). Francisco Jr. alleges that he was personally ousted from his corporate offices, personally stripped of legal representative authority, personally deprived of control over Pamasa and Agrícola El Amate and, by extension, the BSI account and its funds, and personally harmed by the Sisters' false representations to BSI. Even though he is the executor and sole heir of his father's estate (and thus the ultimate beneficial owner of Pamasa, which is independently sufficient to show standing), Francisco Jr. does not ask this Court to probate a will, administer an estate, or distribute estate property; he seeks redress for fraud and a declaration regarding authority over a corporate bank account. Accepting his well-pleaded allegations as true, the Crossclaim alleges a real, concrete, and ongoing injury for standing.

## VII.   FRANCISCO JR. HAS PLAUSIBLY ALLEGED HIS TORT CLAIMS

Francisco Jr. does not dispute that Guatemalan law governs the substantive tort claims or that Rule 9(b) governs the manner of pleading fraud in federal court. Accepting both propositions, the Crossclaim alleges fraud under the doctrine of *dolo* and pleads it with the required particularity.

The Crossclaim likewise alleges claims recognized under Guatemalan law as described by Ambassador Orellana: civil causes of action to challenge transfers made in bad faith to prejudice lawful successors, including annulment of such transfers and extra-contractual civil liability for intentional patrimonial harm. Orellana Rep. at 18.

### A.   Francisco Jr. Plausibly Alleges Fraud Under Guatemalan Law

Under Guatemalan law, as explained in Ambassador Orellana's report, a civil fraud claim rests on the doctrine of *dolo*: (1) intentional conduct designed to deceive; (2) concerning a material fact; (3) that induces reliance; (4) producing economic harm; and (5) a causal link between the

fraudulent conduct, the reliance, and the resulting damage. Francisco Jr. alleges each element with particularity and satisfies Rule 9(b). The entire factual background for Francisco Jr.'s Crossclaim is recited above. *See* Factual Background. For ease of reference, however, we refer the Court to specific paragraphs in which Francisco Jr. has plausibly alleged facts supporting each element:

**<u>Intentional Deception:</u>** Paragraphs 28–33, 30–37, 40–44, 72–73, 78–79, 83–84
**<u>Materiality:</u>** Paragraphs 37, 41, 43–44
**<u>Reliance:</u>** Paragraphs 37, 44, 79
**<u>Causation:</u>** Paragraphs 18–19, 28–33, 37, 40–46, 51–53, 72–73, 78, 80
**<u>Economic Harm and Damage:</u>** Paragraphs 74, 78–80

The Sisters' assertion that no fraudulent statements appear with content, date, time, and place ignores the detailed chronology and specific factual allegations in the Crossclaim. Under Guatemalan law's doctrine of *dolo*, and under Rule 9(b), the fraud claim is sufficiently pleaded.

### B. Francisco Jr. Plausibly Alleges Interference Under Guatemalan Law

Although Guatemalan law does not use the label "intentional interference with inheritance," Mr. Orellana explains that it provides civil remedies, such as annulment for fraud and extra-contractual civil liability, to challenge bad-faith asset transfers that prejudice lawful successors. Orellana Rep. at 18. The Crossclaim pleads precisely that type of conduct.

Francisco Jr. alleges that Valerie and Barbara began, prior to their father's death, a coordinated scheme to undermine his succession plan and prevent assets from passing under his Amended Will. Crossclaim at ¶ 82. He alleges that they stole assets that Francisco Sr. had placed in Pamasa and Agrícola El Amate for estate-planning purposes (*id.* at ¶ 83), including the specific funds in the BSI account that belonged to him and were intended to form part of Francisco Jr.'s inheritance (*id.* at ¶ 84). He further alleges that, through independently tortious means, they orchestrated a takeover of Pamasa to assert a false competing claim to the account and thereby interfere with his ability to inherit those funds. *Id.* at ¶ 88. Francisco Jr. also pleads that he is the sole heir and beneficiary under the Amended Will and had a legitimate expectancy in the estate, including the account funds (*id.* at ¶ 87), that there is a reasonable certainty he would have inherited those funds but for the Sisters' interference (*id.* at ¶ 89), and that he has suffered actual harm as a result (*id.*). These allegations state a claim under Guatemala's broad civil framework.

### <u>CONCLUSION</u>

For the above reasons, the Court must deny the Sisters' Motion to Dismiss.

Dated: February 20, 2026

Respectfully submitted,

**NEIMAN MAYS
FLOCH & ALMEIDA, PLLC**

By: **/s/ Bryan A. Almeida**

Bryan A. Almeida, Esq.
Fla. Bar No. 1005558
balmeida@nmfalawfirm.com

201 S. Biscayne Blvd., Suite 1300
Miami, Florida 33131
Telephone: (305) 434-4942

Jason L. Mays, Esq.
Fla. Bar No. 106495
jmays@nmfalawfirm.com

550 S. Andrews Ave., Suite 720
Fort Lauderdale, Florida 33301
Telephone: (305) 434-4941

*Counsel for Francisco Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 20, 2026, I filed the foregoing document through CM/ECF, which will cause a copy of this document to be delivered, by Notice of Electronic Filing, to all parties and counsel of record.

By: **/s/ Bryan A. Almeida**
Bryan A. Almeida, Esq.

27